## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SKYLEE BUTLER,

    Plaintiff,

          v.

MERCK & CO., INC. and MERCK SHARP & DOHME CORP.,

    Defendants.

Case No. 3:22-CV-10006

## MEMORANDUM IN SUPPORT OF MERCK & CO., INC. AND MERCK SHARP & DOHME CORP.'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

I. INTRODUCTION ........................................................................................................ 1

II. FACTUAL BACKGROUND ...................................................................................... 2

    A. Gardasil Is an FDA-Approved Vaccine that Protects Against Cancers Caused by Certain Types of HPV ................................................................ 2

    B. Gardasil's Safety Is Backed by the FDA, the CDC, and a Worldwide Medical and Scientific Consensus ....................................................... 3

III. ARGUMENT ............................................................................................................... 4

    A. Plaintiff's Warning-Based Claims Are Preempted ................................................... 4

        1. Plaintiff Must Plead Facts Showing that Merck Could Have Changed Gardasil's Label Using the CBE Regulation .............................. 5

        2. Plaintiff Pleads Nothing Satisfying the CBE Regulation's Requirement of "Newly Acquired Information" Demonstrating a "Causal Association" between Gardasil and Any Hazard or Adverse Reaction .......................................... 6

        3. Plaintiff Pleads Nothing Satisfying the CBE Regulation's Requirement that Merck Learned of Risks Previously Unknown to the FDA ................................................................. 11

    B. Plaintiff's Veiled Design Claims Are Preempted under the Vaccine Act .................................................................................................................... 13

    C. Plaintiff's Claims Independently Fail under Massachusetts and Federal Law ............................................................................................................ 14

        1. Plaintiff Fails to State a Manufacturing Defect Claim .............................. 14

        2. Plaintiff's Failure-to-Warn Claims Fail .................................................... 15

        3. Plaintiff's Express Warranty Claim Fails .................................................. 17

        4. Plaintiff's Fraud Claim Fails ..................................................................... 17

        5. Plaintiff's Negligence Claim Fails as An Improper Shotgun Pleading .................................................................................................... 20

IV. CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013) .................................................................................................. 19

*Belanger v. BNY Mellon Asset Mgmt., LLC*,
307 F.R.D. 55 (D. Mass. 2015) ............................................................................................ 20

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ........................................................................................... 2, 5, 6, 14

*Butler v. Sec'y of Health & Hum. Servs.*,
2018 WL 6822354 (Fed. Cl. Nov. 30, 2018) ...................................................................... 10

*Calisi v. Abbott Labs.*,
2013 WL 5441355 (D. Mass. Sept. 27, 2013) ..................................................................... 16

*Colbath v. Merck & Co., Inc.*,
2022 WL 935195 (S.D. Cal. Mar. 29, 2022) ................................................................. 14, 15

*Connell v. BRK Brands, Inc.*,
2013 WL 3989649 (D. Mass. Aug. 1, 2013) ....................................................................... 16

*Flores v. Merck & Co.*,
2022 WL 798374 (D. Nev. Mar. 16, 2022) .................................................................. passim

*Gayle v. Pfizer Inc.*,
452 F. Supp. 3d 78 (S.D.N.Y. 2020)
*aff'd*, 847 F. App'x 79 (2d Cir. 2021) ................................................................................. 10

*Gibbons v. Bristol-Myers Squibb Co.*,
919 F.3d 699 (2d Cir. 2019) ................................................................................ 5, 6, 8, 11

*Goodell v. Bayer HealthCare Pharm. Inc.*,
2019 WL 4771136 (D. Mass. Sept. 30, 2019) ................................................................. 5, 7

*Herlth v. Merck & Co., Inc.*,
2022 WL 788669 (D. Conn. Mar. 15, 2022) ................................................................ passim

*Holmes v. Merck & Co., Inc.*,
697 F.3d 1080 (9th Cir. 2012) ...................................................................................... 14, 16

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
779 F.3d 34 (1st Cir. 2015) ........................................................................................... passim

*In re Zofran (Ondansetron) Prod. Liab. Litig.*,
2017 WL 1458193 (D. Mass. Apr. 24, 2017) .................................................................. 18

*Jackson v. Johnson & Johnson*,
330 F. Supp. 3d 616 (D. Mass. 2018) .......................................................................... 17

*King v. Collagen Corp.*,
983 F.2d 1130 (1st Cir. 1993)....................................................................................... 18

*Knight v. Boehringer Ingelheim Pharms.*, Inc.,
984 F.3d 329 (4th Cir. 2021) ......................................................................................... 8

*Learning Express, Inc. v. Ray-Matt Enters., Inc.*,
74 F.Supp.2d 79 (D. Mass. 1999) ................................................................................ 19

*Merck Sharp & Dohme Corp. v. Albrecht,*
139 S. Ct. 1668 (2019).................................................................................... 4, 10, 11

*Mulder v. Kohl's Dep't Stores, Inc.*,
865 F.3d 17 (1st Cir. 2017).................................................................................... 18, 20

*O'Neil v. Electrolux Home Prod., Inc.*,
2008 WL 2066948 (D. Mass. May 14, 2008) .............................................................. 16

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011)........................................................................................................ 5

*Rodi v. S. New England Sch. of L.*,
389 F.3d 5 (1st Cir. 2004).............................................................................................. 19

*Stratton v. Merck & Co., Inc.*,
2021 WL 5416705 (D.S.C. Nov. 17, 2021)........................................................ 14, 15, 16, 18

*Taupier v. Davol, Inc.*,
490 F. Supp. 3d 430 (D. Mass. 2020) .......................................................................... 17

*Wasylow v. Glock, Inc.*,
975 F.Supp. 370 (D. Mass. 1996) ................................................................................ 15

**Statutes**

21 U.S.C. § 355.............................................................................................................. 10

42 U.S.C. § 262............................................................................................................. 6, 10

42 U.S.C. § 300.......................................................................................................... 14, 16

iii

**Rules**

21 C.F.R. § 201.56 ................................................................................................... 6

21 C.F.R. § 201.57 ........................................................................................ 5, 6, 7, 8

21 C.F.R. § 314.70 ................................................................................................... 6

21 C.F.R. § 601.12 ........................................................................................... passim

21 C.F.R. § 610.15 ................................................................................................. 13

Fed. R. Civ. P. 8 ..................................................................................................... 20

Fed. R. Civ. P. 9 ..................................................................................................... 17

**Other Authorities**

Final Rule, National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury
Table,
86 Fed. Reg. 6249 (Jan. 20, 2021) ...................................................................... 12

H.R. Rep. 99-908, 1986 U.S.C.C.A.N. 6344 ................................................................. 8

National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table,
82 Fed. Reg. 6294 (Jan. 19, 2017) ...................................................................... 12

Requirements on Content and Format of Labeling for Human Prescription Drug and Biological
Products,
71 Fed. Reg. 3922-01 (Jan. 24, 2006)..................................................................... 7

## I. INTRODUCTION

Plaintiff Skylee Butler's Complaint is premised on the unfounded theory that as a result of a single dose of Merck's FDA-approved human papillomavirus ("HPV") vaccine Gardasil on August 21, 2013, she developed medical conditions including postural orthostatic tachycardia syndrome ("POTS"), hypokalemic periodic paralysis ("HOKPP"), and chronic fatigue syndrome ("CFS").[1] Setting aside the absence of scientifically reliable evidence supporting this claim, multiple independent grounds warrant dismissal of Plaintiff's entire Complaint under Rule 12(b)(6).

***First***, as another court recently held in considering nearly identical allegations regarding Gardasil, Plaintiff's warning-based claims (Counts I, II, IV, and V) are preempted because she fails to allege facts that, if proven, would demonstrate that Merck could have added her desired warnings to Gardasil's labeling consistent with federal law. *See Herlth v. Merck & Co., Inc.*, 2022 WL 788669 (D. Conn. Mar. 15, 2022) (dismissing warning-based claims attributed to Gardasil administered in October and December 2013). The First Circuit has held that plaintiffs who sue regarding FDA-approved products must "allege[ ] a labeling deficiency that [the defendant] could have corrected using the ['Changes Being Effected,' or] CBE regulation" to survive a motion to dismiss. *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41 (1st Cir. 2015). Here, Plaintiff pleads nothing that, if true, would show that Merck could have used the CBE regulation applicable to vaccines, 21 C.F.R. § 601.12(f)(2), to add her desired warnings to Gardasil's

---

[1] POTS is a condition that affects circulation (blood flow). It involves the autonomic nervous system (which automatically controls and regulates vital bodily functions) and the sympathetic nervous system (which activates the fight or flight response). The majority of POTS patients are women aged 13 to 50. Between one and three million people suffer from POTS in the United States. *See* Ex. A, Cleveland Clinic, Postural Orthostatic Tachycardia Syndrome (POTS). HOKPP is periodic paralysis characterized by a fall in potassium levels in the blood. Ex. B, Cleveland Clinic, Familial Periodic Paralyses. CFS is a condition characterized by extreme exhaustion lasting for at least six months. According to the Cleveland Clinic, the cause of ME/CFS is unknown. Ex. C, Cleveland Clinic, Myalgic Encephalomyelitis/Chronic Fatigue Syndrome ("ME/CFS").

1

label before her only dose in August 2013. *See* Compl. ¶ 343. Thus, her warning-based claims fail.

**Second**, although Plaintiff avoids explicitly naming any of her claims "Design Defect," her Complaint is riddled with attacks on Gardasil's design. The Supreme Court has held that the Vaccine Act expressly preempts design-defect claims against vaccine manufacturers like Merck. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 243 (2011). The Court should dismiss Plaintiff's claims to the extent that they challenge the intended composition of Gardasil and its components, including Counts I (Negligence) and III (Implied Warranty: Manufacturing Defect).

**Third**, Plaintiff's theories also run afoul of applicable Massachusetts law and federal pleading standards. That provides an independent reason to dismiss each claim, just as other courts have held in evaluating nearly identical allegations against Gardasil under Rules 8 and 9. *See Flores v. Merck & Co.*, 2022 WL 798374 (D. Nev. Mar. 16, 2022) (granting motion to dismiss in full).

## II.   FACTUAL BACKGROUND

### A.   Gardasil Is an FDA-Approved Vaccine that Protects Against Cancers Caused by Certain Types of HPV

Gardasil is an FDA-approved vaccine that protects against cervical, vulvar, vaginal, and anal cancer and their associated precancerous lesions, as well as genital warts, caused by certain types of HPV. Ex. D, 3/2013 Gardasil Patient Information.[2] First approved in the U.S. in 2006, Gardasil prevents infection with HPV types 16 and 18, "two high-risk HPVs that cause about 70% of cervical cancers and an even higher percentage of some of the other HPV-caused cancers," and types 6 and 11, "which cause 90% of genital warts."[3] Ex. E, National Institutes of Health ("NIH"), National Cancer Institute, HPV Vaccines.

---

[2] Merck requests that the Court consider all materials cited herein for the reasons set out in the contemporaneously filed Request for Judicial Notice.

[3] In 2014, the FDA initially approved Gardasil 9. Gardasil 9 provides protection from HPV infection from the same four HPV types in Gardasil (types 6, 11, 16, and 18), but adds protection for

Case 3:22-cv-00406-RJC   Document 8   Filed 04/28/22   Page 7 of 27

HPV is a viral infection that affects millions of Americans. The CDC estimates that "85% of people will get an HPV infection in their lifetime," and nearly 42 million people in the United States are currently infected with HPV. Ex. F, CDC, Reasons to Get Vaccinated; Ex. G, CDC, HPV Vaccination & Cancer Prevention. HPV is a known cause of cervical cancer, as well as some cancers of the vulva, vagina, penis, anus, and oropharynx. *See* Ex. H, CDC, HPV and Cancer, Basic Information. Even with screenings, "HPV causes 11,000 cases of cervical cancer in the U.S.," and the CDC estimates approximately "196,000 cervical precancer cases" annually. Ex. I, CDC, Cancers Caused by HPV Are Preventable.

With very limited exceptions inapplicable to Plaintiff, "CDC recommends HPV vaccination for everyone through age 26 years, if not vaccinated already." Ex. J, CDC, What Can I Do to Reduce My Risk of Cervical Cancer. Since HPV vaccines like Gardasil have been in use in the U.S., the CDC has reported that "HPV infections and cervical precancers…have dropped significantly." Ex. K, CDC, When to Get HPV Vaccine. For example, "[a]mong teen girls, infections with HPV types that cause most HPV cancers and genital warts have dropped 86 percent," and "[a]mong vaccinated women, the percentage of cervical precancers caused by the HPV types most often linked to cervical cancer has dropped by 40 percent." *Id*. In short, as stated by the CDC, HPV vaccines like Gardasil "provide[] safe, effective, and lasting protection against the HPV infections that most commonly cause cancer." Ex. G.

**B.  Gardasil's Safety Is Backed by the FDA, the CDC, and a Worldwide Medical and Scientific Consensus**

Even today, years after Plaintiff's single alleged Gardasil dose, the FDA, CDC, NIH, WHO, other regulatory authorities, reputable medical and scientific organizations, and countless

---

other oncogenic HPV types 31, 33, 45, 52, and 58. Because of the additional protections provided by Gardasil 9, the quadrivalent Gardasil has been superseded and is no longer used in the U.S.

3

reliable peer-reviewed studies continue to find that Gardasil is both safe and effective.

- The "FDA and CDC continue to find that Gardasil is a safe and effective vaccine," find that Gardasil's "benefits continue to outweigh its risks," and "monitor the safety of this vaccine, with the public's health and safety" serving as those federal agencies' "top priority." Ex. L, FDA, Gardasil Vaccine Safety. According to the CDC, "[t]here have been no confirmed safety signals (i.e., higher than expected number of adverse events) observed, with the exception of [ ] fainting," which "can happen after any medical procedure." Ex. M, CDC, Questions about HPV Vaccine Safety.

- The WHO's Global Advisory Committee on Vaccine Safety "considers HPV vaccines to be extremely safe" and has stated "there is still no evidence to suggest a causal association between HPV vaccine and . . . POTS or the diverse symptoms that include pain and motor dysfunction." Ex. N, WHO, Safety Update of HPV Vaccines.

- The EMA has also stated that "the available evidence does not support that . . . POTS [is] caused by HPV vaccines," noted "a large published study that showed no link between HPV vaccine and CFS," and concluded that "[t]he benefits of HPV vaccines . . . continue to outweigh their risks." Ex. O, EMA, HPV vaccines: EMA confirms evidence does not support that HPV vaccines cause CRPS or POTS.

## III.  ARGUMENT

### A.  Plaintiff's Warning-Based Claims[4] Are Preempted

Whether a failure-to-warn claim is preempted is a legal question for the Court to decide. *Merck Sharp & Dohme Corp. v. Albrecht,* 139 S. Ct. 1668, 1679 (2019). As the First Circuit has held, "a necessary step in defeating [the] preemption defense" for FDA-approved products at the motion-to-dismiss stage "is to establish that the complaint alleges a labeling deficiency that [the defendant] could have corrected using the ['Changes Being Effected,' or] CBE regulation." *Celexa*, 779 F.3d at 41. In considering nearly identical allegations regarding Gardasil, another

---

[4] Plaintiff's claims for negligence, "failure to warn," breach of express warranty, and fraud (Counts I, II, IV, and V) are all warning-based claims. *See* Compl. ¶ 378 (Count I alleging negligence in a failure "to provide adequate warnings"), ¶ 389 (Count II, alleging "breach of implied warranty of merchantability claim against Merck for failure to warn"), ¶ 430 (Count IV, alleging a breach of express warranty because Gardasil is "associated with a myriad of dangerous and undisclosed risks"), ¶ 445 (Count V, alleging fraud because Merck's "express representations included incomplete warnings . . . [and] fail[] to include the complete array of risks associated with Gardasil").

4

court ruled that the plaintiff failed this requirement. *Herlth*, 2022 WL 788669, at \*3. And just as

in *Herlth*, the Complaint here lacks allegations that, if true, would have allowed Merck to use the

CBE regulation to add warnings regarding the risks Plaintiff alleges before her only dose of Gar-

dasil in August 2013. *See* Compl. ¶ 343. In particular:

- Plaintiff fails to plead facts showing Merck received "newly acquired information" before August 2013 demonstrating a "causal association" between Gardasil and any "clinically significant" "hazard" or "adverse reaction." *See* 21 C.F.R. §§ 201.57(c)(6)(i); 601.12(f)(2).

- Even if Plaintiff had pled such information, she *also* fails to plead anything pertinent to her alleged injuries that "reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to the FDA." *See* 21 C.F.R. §601.12(f)(2), (6).

Failure to plead facts satisfying *either* of these *independent* requirements of the CBE regulation

shows that Plaintiff's claims are preempted; in this case, Plaintiff fails both requirements. Accord-

ingly, Plaintiff's warning-based claims should be dismissed.[5]

### 1.   Plaintiff Must Plead Facts Showing that Merck Could Have Changed Gardasil's Label Using the CBE Regulation

The FDA's approval process for vaccines like Gardasil places "onerous and lengthy" re-

quirements upon the company seeking approval. *See Celexa*, 779 F.3d at 42 (discussing approval

process for prescription medicines); *Bruesewitz*, 562 U.S. at 226 (noting that "vaccines have been

subject to the same federal premarket approval process as prescription drugs"). When the FDA

grants approval, the "vaccine's license spells out the . . . warnings that must" appear in the label

that "accompan[ies] the product." *Bruesewitz*, 562 U.S. at 237.

After the vaccine's approval, changes to its warning label are strictly circumscribed, and

---

[5] *See, e.g.*, *Celexa*, 779 F.3d at 42 (affirming dismissal of claims as preempted at motion-to-dismiss stage); *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019) (same); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 624 (2011) (same);  *Herlth*, 2022 WL 788669 (dismissing claims as preempted under Rule 12(b)(6)); *Goodell v. Bayer HealthCare Pharm. Inc.*, 2019 WL 4771136, at \*4 (D. Mass. Sept. 30, 2019) (same).

"[m]anufacturers ordinarily must obtain the Food and Drug Administration's . . . approval ***before*** modifying" the warnings that accompany a vaccine. *Bruesewitz*, 562 U.S. at 237 (emphasis added) (citing 21 C.F.R. § 601.12).[6] More specifically, "FDA approval must be obtained before distribution of the product with [a] labeling change" unless a change is permitted under 21 C.F.R. § 601.12(f)(2), the "CBE" regulation for vaccines.[7] *See* 21 C.F.R. § 601.12(f)(1).

In light of this comprehensive regulatory scheme, Plaintiff must "allege[ ] a labeling deficiency that [Merck] could have corrected using the CBE regulation" to survive a motion to dismiss."[8] *Celexa*, 779 F.3d at 41–42; *see also Gibbons*, 919 F.3d at 708. In other words, Plaintiff's warning claims are "preempted by federal law unless she has pleaded a labeling deficiency that Merck could have ***unilaterally*** corrected in accordance with the requirements of the CBE regulation." *Herlth*, 2022 WL 788669, at *3 (emphasis added). She has not done so here.

### 2. Plaintiff Pleads Nothing Satisfying the CBE Regulation's Requirement of "Newly Acquired Information" Demonstrating a "Causal Association" between Gardasil and Any Hazard or Adverse Reaction

---

[6] Vaccines are considered "biologics" or "biological products." 42 U.S.C. § 262(i) ("The term 'biological product' means a . . . vaccine [among other substances].") As explained in 21 C.F.R. § 201.57 and 21 C.F.R. § 201.56(b)(1), and based on Gardasil's 2006 initial approval date, *see* Ex. D at 1, Gardasil's labeling is governed by Section 201.57. As noted in 21 C.F.R. § 201.57(c)(6)(i), labeling ***changes*** for biological products such as Gardasil are governed by 21 C.F.R. § 601.12. And as discussed below, the standard for labeling changes under 21 C.F.R. § 601.12(f)(2), the provision relevant to this motion, incorporates the labeling criteria in 21 C.F.R. § 201.57(c)(6)(i).

[7] The regulation also permits manufacturers to make very specific label changes without prior FDA approval or "CBE" supplement, but these narrow categories are not relevant to any of Plaintiff's claims. *See* 21 C.F.R. § 601.12(f)(3) (allowing, e.g., changes to the manufacturer's address).

[8] Although *Celexa* discussed the CBE regulation for non-vaccine pharmaceuticals, the equivalent CBE regulation for vaccines creates the same requirements for label changes. *Compare* 21 C.F.R. § 314.70(c)(6)(iii)(A), *with* 21 C.F.R. § 601.12(f)(2)(i)(A); *see also Herlth*, 2022 WL 788669, at *3 n.24. Notably, both the vaccine and non-vaccine CBE regulations require the presence of "newly acquired information," which they define in the same way. *Compare* 21 C.F.R. § 314.70(c)(6)(iii), *with* 21 C.F.R. § 601.12(f)(2)(i)(A). Further, both regulations incorporate the scientific requirements in 21 C.F.R. § 201.57(c) as a limitation on when manufacturers may change their labels. *Compare* 21 C.F.R. § 314.70(c)(6)(iii)(A), *with* 21 C.F.R. § 601.12(f)(2)(i)(A).

To satisfy the CBE regulation for vaccines, Plaintiff must plead facts showing that (1) Merck received "newly acquired information" before her only Gardasil dose, ***and*** (2) that the new information demonstrated "a causal association" between Gardasil and "a clinically significant" "hazard" or "adverse reaction." *See* 21 C.F.R. §§ 201.57(c)(6)(i); 601.12(f)(2); *Herlth*, 2022 WL 788669, at *3. Since preemption bars state tort law from second-guessing the FDA's approved label, states may impose liability only if "new information not considered by the FDA" that satisfies the CBE regulation develops ***after*** the FDA approves a product's initial label.[9] *Celexa*, 779 F.3d at 41; *Herlth*, 2022 WL 788669, at *3; *Goodell*, 2019 WL 4771136, at *4. And to satisfy the CBE regulation, that "new[] . . . information" must provide "reasonable evidence of a causal association" of "a clinically significant" "hazard" or "adverse reaction" linked to a vaccine. *See* 21 C.F.R. § 201.57(c)(6)(i) (standard for label change under CBE regulation); 601.12(f)(2), (6) (CBE regulation for vaccines); *see also Herlth*, 2022 WL 788669, at *4. To be "clinically significant," the adverse reaction must "have significant impact on therapeutic decisionmaking," *see* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922-01, 3946 (Jan. 24, 2006), such as a risk that is "potentially fatal, [or otherwise] serious" 21 C.F.R. § 201.57(c)(6)(i).[10]

---

[9] In reality, as courts in the First Circuit and elsewhere have ruled, a plaintiff must plead new information satisfying the CBE regulation that arose during a narrower period of time: ***after*** the FDA's approval of the ***operative*** Gardasil label at the time of Plaintiff's vaccination, and ***before*** Plaintiff last received Gardasil. *See, e.g.*, *Goodell*, 2019 WL 4771136, at *4 (requiring pleading of information arising after approval of operative product label and before plaintiff's last use of product). Merck chooses not to rely on that narrower time period here in light of Plaintiff's failure to allege information satisfying the CBE regulation at ***any time*** before her single Gardasil dose in August 2013. *Accord Herlth*, 2022 WL 788669.

[10] Merck anticipates that Plaintiff will mischaracterize *Bruesewitz* to argue that the Vaccine Act preempts only design claims, and that Plaintiff's warning claims cannot be preempted in the way Merck explains here. As the *Herlth* court recognized, that argument would be incorrect for numerous reasons. First, Merck's arguments showing that Plaintiff's warning-based claims are preempted rely on FDA labeling regulations promulgated pursuant to the Federal Food, Drug, and

Here, Plaintiff fails to show that Merck could have satisfied these federal requirements to lawfully add Plaintiff's desired warning—regarding POTS or any of the other conditions she alleges—at ***any time*** before she received Gardasil on August 21, 2013. *See Herlth*, 2022 WL 788669, at *4 ("apart from [] conclusory allegation[s], [plaintiff] does not allege newly acquired information containing 'reasonable evidence' as required under 21 C.F.R. § 201.57(c)(6)(i) of a causal association between Gardasil and POTS."). This is unsurprising given the FDA's public statements that the agency "ha[s] been closely monitoring the safety of Gardasil," that the FDA "has not identified any issues affecting the safety, purity and potency of Gardasil," and that "Gardasil continues to be safe and effective." Ex. L; *see Knight v. Boehringer Ingelheim Pharms., Inc.*, 984 F.3d 329, 339 (4th Cir. 2021) (no newly acquired information supporting proposed warning where "the FDA has continued to approve labels" at odds with the warning). Plaintiff pleads absolutely no "newly acquired information" showing that Gardasil causes any "clinically significant" "adverse reaction[]" relevant to the injuries she alleges in this case. *See Gibbons*, 919 F.3d at 708; 21 C.F.R. §§ 201.57(c)(6)(i); 601.12(f)(2). As the *Herlth* court concluded, Plaintiff's alleged scientific developments and publications, including the following, all fail to satisfy the CBE regulation:

- Developments ***after*** Plaintiff last used Gardasil on August 21, 2013, which are irrelevant because Merck could not have changed the label before Plaintiff's Gardasil use based on alleged post-use evidence. *See, e.g.*, Compl. ¶¶ 276, 373; *Knight*, 984 F.3d at 338 (article published after the plaintiff's use of the product was not relevant because "the information in it would not have made any difference to" the plaintiff).

Cosmetic Act ("FDCA") and the Public Health Service Act ("PHSA") – ***not*** the Vaccine Act. The FDCA and PHSA, and the regulations promulgated under each, are separate from the Vaccine Act and have their own preemptive effects. *Herlth*, 2022 WL 788669, at *5. Further, by enacting the Vaccine Act, Congress intended to create legal protections for vaccine manufacturers that are ***broader*** than those given to drug manufacturers. *See* H.R. Rep. 99-908, 12-13, 1986 U.S.C.C.A.N. 6344, 6353–54 (noting that "the system is intended to lessen the number of lawsuits against manufacturers"). "It makes no sense to infer from the fact that Congress decided to make it harder to sue a vaccine maker for a design defect that it must have intended to open the floodgates to suing vaccine makers for a failure to warn." *Herlth*, 2022 WL 788669 at *5.

- Threadbare allegations without any support or factual elaboration, such as claims that "reports coming in from all over the world" alleged negative medical conditions from Gardasil, including conditions Plaintiff does not allege here, such as "strokes," "multiple sclerosis," and "suicides." *See, e.g.*, Compl. ¶¶ 295–298.

- Articles that provide no new scientific information at all, and instead baselessly attack Merck's media or business strategy. *See, e.g.*, Compl. ¶¶ 72, 73, 89–91, 98, 330–32.

- Publications that are not relevant to POTS or any of Plaintiff's other alleged injuries. *See, e.g.*, Compl. ¶ 156 (claiming that "Polysorbate 80 was implicated as a cause, possibly with other components, of anaphylaxis in Gardasil recipients in a study in Australia").

- Articles that are not related to vaccines or Gardasil. *See, e.g.*, Compl. ¶¶ 17–20 (citing articles about Vioxx not relevant to Gardasil); ¶ 272 (citing Ex. P, Li et al., *Autoimmune Basis for Postural Tachycardia Syndrome*, 3 J. American Heart Assoc. (2014) (article that does not mention vaccines in general or Gardasil in particular)).

- Articles that Plaintiff claims provide general information about risk factors for cervical cancer. *See, e.g.*, Compl. ¶¶ 33, 35, 39 (citing Ex. Q, de Freitas et al., *Susceptibility to cervical cancer: An Overview*, 126 Gynecologic Oncology 305 (August 2012)).

- Publications providing mere "hypotheses" or "preliminary conclusions" that do not satisfy the CBE regulation because they "describe no more than a theoretical relationship between Gardasil and POTS." *Herlth*, 2022 WL 788669, at *4.[11] *See, e.g.*, Compl. ¶ 132 (citing Ex. S, Kanduc, *Peptide Cross-reactivity: The Original Sin of Vaccines*, 4 Frontiers in Bioscience 1393 (June 2012) (offering theoretical discussions about "possible" biological means by which vaccines "might be a source of" various conditions));[12] ¶ 158 (citing Ex. V, Rinaldi et al., *Anti-Saccharomyces Cerevisiae Autoantibodies in Autoimmune Diseases: from Bread Baking to Autoimmunity*, 45 Clinical Reviews in Allergy and Immunology 152 (October 2013) (article reviewing previous literature and concluding with authors "wonder[ing] about the potential limitations" of using yeast in vaccines generally)); ¶¶ 273, 361 (citing Ex. W, Blitshteyn, *Postural Tachycardia Syndrome After Vaccination with Gardasil*, 17 European J. of Neurology e52 (2010) ("letter to the editor" discussing the experience of one patient after receiving Gardasil, stating that cause of disease "remains elusive," and calling for more research)); *id.* (citing Ex. X, Blitshteyn, *Postural Tachycardia Syndrome Following Human Papillomavirus Vaccination*, 21 European J. of Neurology

---

[11] Other articles cited in Plaintiffs' Complaint are even further afield and do not even suggest any link whatsoever between Gardasil and any adverse reaction. *See, e.g.*, Compl. ¶ 283 (citing Ex. R, Little et al., *Premature ovarian failure 3 years after menarche in a 16-year-old girl following human papillomavirus vaccination* (2012) (case report of one patient explicitly not concluding that Gardasil or other HPV vaccine caused symptoms)).

[12] Beyond the fact that Plaintiff does not claim to suffer from autism, and that the article merely speculates as to any causal link between vaccines and autism, the CDC and FDA have repeatedly stated that "[v]accines do not cause autism." *See* Ex. T, CDC, Autism and Vaccines; *see also* Ex. U, FDA, Vaccines for Children - A Guide for Parents and Caregivers.

9

135 (2014) (discussing six patients and concluding that "[f]urther studies are necessary to investigate whether there is a causal relationship" between Gardasil and POTS).[13] *See Gayle v. Pfizer Inc.*, 452 F. Supp. 3d 78, 88 (S.D.N.Y. 2020) ("some 6,000 adverse event reports" did "not constitute 'newly acquired information'" because they did not "demonstrate 'reasonable evidence of a causal association'"), *aff'd*, 847 F. App'x 79 (2d Cir. 2021).

Further, the FDA's decision not to require Plaintiff's desired warnings confirms that no evidence supporting such warnings existed ***at any time***.[14] "Congress has imposed on the FDA a duty to initiate a label change if [it] becomes aware of new information, including any new safety information[,] that the [agency] determines should be included in the labeling of the drug." *Albrecht*, 139 S. Ct. at 1684 (Alito, J., concurring) (cleaned up) (quoting 21 U.S.C. § 355(o)(4)(A)[15]). Here, the FDA has long been aware of Plaintiff's unfounded theories. *See* Sec. III.A.3, *infra*. Indeed, the FDA was ***specifically aware*** of the facts Plaintiff alleges in this case. Its parent agency, the Department of Health and Human Services ("HHS") opposed Plaintiff's petition filed in the Vaccine Court before she sued here—a petition that was required to make all the same claims brought in this lawsuit. *See Butler v. Sec'y of Health & Hum. Servs.*, 2018 WL 6822354 (Fed. Cl. Nov. 30, 2018). Plaintiff does not allege, nor could she, that the FDA required Merck to make any change to Gardasil's label based on HHS's experience opposing Plaintiff's petition in Vaccine

---

[13] The author of these 2010 and 2014 articles later agreed that, based on her research, "a causal relationship ***has not been supported***" between Gardasil and an adverse reaction. Ex. Y, Blitshteyn, *Human papillomavirus (HPV) vaccine safety concerning POTS, CRPS and related conditions*, Clinical Autonomic Research (2019) (emphasis added).

[14] Certain of Plaintiff's claimed injuries were already in the operative Gardasil warning label in 2013. For example, Gardasil's labeling included warnings about "seizures," "dizziness," "nausea," and "syncope." *See* Ex. D, at 1, 3–11, 28–29. ***The first page*** of the Gardasil label included explicit warnings regarding "nausea" and "dizziness." That same first page included explicit warnings of "syncope" (fainting) as well as "seizure-like activity." *See id.* To the extent Plaintiff claims the label should have provided more or stronger warnings about these risks, her claims are preempted: Plaintiff fails to plead facts showing Merck could have satisfied regulatory requirements for providing any different warnings about these risks.

[15] *See also* 42 U.S.C. § 262(a)(2)(D) (stating that "section[] 505(o)" of the FDCA, codified at 21 U.S.C. § 355(o), applies to biologics such as vaccines).

Court. Where, as here, "the FDA declines to require a label change despite having received and considered information regarding a new risk, the logical conclusion is that the FDA determined that a label change was unjustified." *Albrecht*, 139 S. Ct. at 1684 (Alito, J., concurring).

In short, Plaintiff has not pled any facts showing that Merck could have used the CBE regulation to add Plaintiff's desired warnings to Gardasil's labeling before she received Gardasil.

### 3. Plaintiff Pleads Nothing Satisfying the CBE Regulation's Requirement that Merck Learned of Risks Previously Unknown to the FDA

Plaintiff also fails to plead facts showing that the FDA was unaware of any supposedly new information pertinent to her alleged injuries, an independent reason her claims are preempted. Merck can only change Gardasil's warnings unilaterally under the CBE regulation "to reflect *newly* acquired information," which is limited to information that "reveal[s] *risks of a different type or greater severity or frequency* than previously included *in submissions to FDA*." 21 C.F.R. §601.12(f)(2)(i), (6) (emphasis added); *see Gibbons*, 919 F.3d at 708; *Celexa*, 779 F.3d at 42 n.5. In *Gibbons*, the Second Circuit—using the same standard in the CBE regulation for non-vaccine pharmaceuticals[16]—affirmed the dismissal of a complaint that "provide[d] no basis upon which the court could conclude that" any new information "presented a different type of risk than those the company had discussed with the FDA, or [any risk] more severe or more frequent than . . . [those] the government already knew about." 919 F.3d at 708; *see also Celexa*, 779 F.3d at 42, n.5 (even if evidence qualified as "newly acquired information," claim preempted when "Plaintiffs do not argue . . . that the FDA was unaware" of it and evidence does not "disclose[] 'risks of a different type or greater severity or frequency than previously included in submissions to the FDA.'").

Similarly here, Plaintiff fails to plead that any information in the Complaint differed from

---

[16] *See* n.8, *supra*.

what the FDA previously considered. Although the articles referenced in Plaintiff's Complaint fail

to satisfy the CBE regulation for other reasons, *see* Sec. III.A.2, *supra*, Plaintiff also fails to allege

that the FDA was unaware of them. That is no surprise: the "FDA and CDC closely monitor the

safety of" Gardasil. *See* Ex. H. And the FDA and CDC reject an association between Gardasil and

the risks Plaintiff claims, including her primary alleged injury, POTS. For example:

- In 2017, long after Plaintiff's dose, HHS stated publicly: "***To date, there is no medical or scientific evidence that the HPV vaccine causes POTS and safety monitoring has not shown any other problems***." National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 82 Fed. Reg. 6294, 6298 (Jan. 19, 2017) (emphasis added).[17]

- Echoing this conclusion is a 2018 publication co-authored by CDC and FDA officials; it states that the data regarding POTS did not "me[et] the threshold for" a "data mining signal" creating safety concerns, and "***did not reveal any information that would suggest a causal association***" between POTS and Gardasil.[18]

What is more, the CDC and FDA have rejected the many absurd theories advanced by

Plaintiff and her counsel, which arise from "anti-vaxxer" conspiracies:

- Plaintiff alleges Gardasil "contains Polysorbate 80," a chemical she claims is "associated with many health injuries," including "infertility." Compl. ¶¶ 152–56. "Anti-vaxxers" have appeared before the FDA for over a decade to claim that "polysorbates can be a health hazard" and "ha[ve] been known to cause fertility issues," even going so far as to claim vaccines containing "polysorbate 80" are "***tantamount to genocide*** against" "ten percent . . . of our population" who are sensitive to them. Ex. BB, Excerpts of the 9/9/2009 FDA VRBPAC Meeting Tr. at 136, 137, 242 (emphasis added). The FDA has debunked these theories, publicly stating that polysorbate 80 is an example of "[c]ommon [i]ngredients" in vaccines, as it "helps ingredients mix together and keep them from separating." *See* Ex. CC, FDA, Common Ingredients in U.S. Licensed Vaccines. Further, the FDA has explicitly been aware that polysorbate 80 is a Gardasil constituent since at least 2006, as it approved labeling identifying it as such. *See* Ex. DD, 6/2006 Gardasil Label, at 1.

- Plaintiff claims Gardasil contains a "potentially hazardous ingredient, HPV LI-DNA fragments." Compl. ¶¶ 135–45. The FDA has long known "Gardasil does contain recombinant

---

[17] *See also* Final Rule, National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 86 Fed. Reg. 6249, 6251 (Jan. 20, 2021).

[18] *See* Ex. Z, Arana et al., *Post-licensure safety monitoring of quadrivalent human papillomavirus vaccine in the Vaccine Adverse Event Reporting System (VAERS) 2009–2015*, 36 Vaccine 1781, 1786 (2018) (cited in Ex. AA, CDC, HPV Vaccine Safety Information) (emphasis added).

HPV L1-specific DNA fragments," and that "[t]he presence of these DNA fragments is expected, is not a risk to vaccine recipients, and is not a safety factor." Ex. EE, FDA, FDA Information on Gardasil–Presence of DNA Fragments Expected, No Safety Risk (2011).

- Plaintiff alleges that Gardasil's aluminum adjuvant is "toxic" and "can result in very serious harm." Compl. ¶¶ 127–33. The FDA has heard complaints from laypersons about aluminum adjuvants—and has debunked them forcefully and publicly. Federal law explicitly allows aluminum adjuvants in vaccines, 21 C.F.R. § 610.15, the FDA has long been aware that Gardasil contains aluminum,[19] and the FDA has stated, "[a]luminum adjuvant containing vaccines have a demonstrated safety profile of over six decades of use and have only uncommonly been associated with severe local reactions." *See* Ex. CC.

- Although Plaintiff cannot make any claims directly based on Gardasil's ingredients and development—since all would be preempted as design defect claims, *see* Sec. III.B, *infra*—the FDA has likewise heard, and rejected, Plaintiff's other scientifically baseless allegations, including about Gardasil's trials[20] and Gardasil's supposed lack of efficacy.[21]

Plaintiff fails to plead any facts regarding her alleged injuries that were unknown to the

FDA. This is another reason her claims are preempted. *See* 21 C.F.R. § 601.12(f)(2), (6).

### B.     Plaintiff's Veiled Design Claims Are Preempted under the Vaccine Act

Plaintiff avoids explicitly naming any of her counts a "design defect" claim, and for good

---

[19] *See* Ex. FF, Excerpt of 12/7/2010 FDA Pediatric Advisory Committee Meeting Trans. at 103 ("As with many other inactivated or protein sub-unit vaccines, [Gardasil is] adjuvanted with an aluminum salt[.]").

[20] *Compare, e.g.*, Compl. ¶¶ 176–77 (claiming that "[a]lthough nine to 12-year-olds are the primary target population for HPV vaccines, Merck used only a small percentage of this age group in the clinical trials"), *with* Ex. GG, 5/18/2006 Excerpt of the VRBPAC Meeting Tr. at 29 (Merck scientist noting at FDA Advisory Committee meeting that "Gardasil . . . . will be most effective when it's administered to . . . the age group 15 and below [, but] it was not feasible to do efficacy studies in this population . . . . [s]o, FDA and Merck agreed that we could bridge the efficacy findings in 16 to 26 year old [sic] to the younger age range using immuno-bridging approaches."); *id.* at 110, 114 (FDA official agreeing with Merck's approach).

[21] *Compare, e.g.*, Compl. ¶ 61 ("Merck knows . . . that Gardasil . . . [is] far less effective than Pap tests in preventing cervical cancer"); Ex. BB at 238 (public commenter asks "[w]hy weren't we told . . . that the best and proven way to prevent cervical cancer is with annual Pap smears . . . ?"), *with* Ex. HH, FDA, HPV Factsheet (Gardasil to be used *in addition to* Pap ("All women should get regular Pap tests.")) and Ex. II, CDC, HPV Vaccine Information For Young Women ("it is important that women continue to be screened for cervical cancer, even after getting all recommended shots of the HPV vaccine").

reason—the U.S. Supreme Court has held that design-defect claims are expressly preempted by the Vaccine Act. *See Bruesewitz*, 562 U.S. 223; 42 U.S.C. § 300aa-22(b)(1); *see also Holmes v. Merck & Co., Inc.*, 697 F.3d 1080, 1084 (9th Cir. 2012) ("Section 22 expressly preempts design-defect claims"). However, Plaintiff's Complaint includes poorly disguised design-defect claims masquerading as other causes of action. The most glaring examples include Plaintiff's negligence claim (Count I), which is premised in part on Merck's duty to exercise reasonable care in the "design . . . of Gardasil," Compl. ¶¶ 370 and asserts that Merck purportedly failed "to use reasonable and prudent care in the research, manufacture, . . . and development of Gardasil." Compl. ¶ 379(k). Plaintiff's "manufacturing defect" claim (Count III), which alleges that *all* Gardasil doses suffer from a "manufacturing defect" due to their intended constituents, is also just a design-defect claim by another name. Compl. ¶¶ 415-417. The Court should dismiss those claims as preempted, as several federal courts have already done. *See Colbath v. Merck & Co., Inc.*, 2022 WL 935195, at *5 (S.D. Cal. Mar. 29, 2022); *Flores*, 2022 WL 798374, at *3; *Herlth*, 2022 WL 788669, at *5-6; *Stratton v. Merck & Co., Inc.*, 2021 WL 5416705, at *2 (D.S.C. Nov. 17, 2021).

### C. Plaintiff's Claims Independently Fail under Massachusetts and Federal Law

Plaintiff's claims independently fail under Massachusetts law and federal pleading standards. Another federal court recently dismissed a plaintiff's entire complaint for the exact reasons outlined below. *See Flores*, 2022 WL 798374 (dismissing complaint because plaintiff's negligence claim was preempted and inadequately pled under Rule 8; plaintiff failed to plead a manufacturing-defect claim; warning claims based on a failure to warn the plaintiff directly were preempted; plaintiff's allegations regarding Merck's alleged failure to warn her physician, including in her warranty claim, were "conclusory and [did] not yield a facially plausible claim" (*id.* at *5); and plaintiff's fraud allegations failed under Rule 9). The same result should follow here.

### 1. Plaintiff Fails to State a Manufacturing Defect Claim

14

Aside from being preempted, Plaintiff's manufacturing defect claim fails because she does not allege that her ***particular*** Gardasil dose was defective. "A defect from manufacturing, as opposed to design, occurs when a product differs from identical products issued from the same manufacturer." *Wasylow v. Glock, Inc.*, 975 F.Supp. 370, 377 (D. Mass. 1996). Where a product "was manufactured exactly as intended," there is no manufacturing defect claim. *Id.* at 377-78.

Plaintiff does not allege how her doses deviated from Merck's standards and FDA-approved processes, instead simply concluding that the Gardasil doses she received "failed to comply with manufacturing specifications" by "containing ingredients and toxins." Compl. ¶¶ 415–417. This conclusory pleading does not allege ***any*** facts showing that her doses were manufactured defectively. The Court should join every federal court to address these allegations and find Plaintiff fails to state a manufacturing-defect claim. *See Colbath*, 2022 WL 935195, at \*5; *Flores*, 2022 WL 798374, at \*7; *Herlth*, 2022 WL 788669, at \*5-6; *Stratton*, 2021 WL 5416705, at \*3-4.

### 2. Plaintiff's Failure-to-Warn Claims Fail

Plaintiff does not state a failure-to-warn claim under either a negligence (Count I) or implied warranty (Count II) theory. Plaintiff's theory that Merck failed to directly warn her fails as a matter of law, and she fails to plead any facts to claim Merck's alleged failure to warn her physician, Dr. Amy Pelletier, actually caused her injuries.

***First***, Plaintiff's theories based on Merck's alleged failure to warn her or her mother[22] contravene the Vaccine Act and the learned intermediary doctrine. Under the Act, "[n]o vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury . . .

---

[22] *See, e.g.*, Compl. ¶¶ 396, 400 (alleging Merck "failed to warn of the risks associated with Gardasil" and that "Plaintiff relied upon the skill, superior knowledge, and judgment of Merck"); ¶ 379(o) (alleging Merck was negligent in "[f]ailing to disclose to Plaintiff and her medical providers, and to the general public that use of and exposure to Gardasil presents severe risks").

solely due to the manufacturer's ***failure to provide direct warnings to the injured party***." 42 U.S.C. § 300aa-22 (emphasis added); *see Holmes*, 697 F.3d at 1083 (the Act "eliminated liability for not providing direct warnings to a claimant"); *Flores*, 2022 WL 798374, at \*4 (claim premised on "Merck's alleged failure to warn [plaintiff] and her mother is preempted by the Vaccine Act"); *Stratton*, 2021 WL 5416705, at \*5 (similar). This claim is also foreclosed by Massachusetts's learned intermediary doctrine, which provides that a "manufacturer's duty to warn of dangers associated with its product runs only to the physician; it is the physician's duty to warn the ultimate consumer." *Calisi v. Abbott Labs.*, 2013 WL 5441355, at \*3 (D. Mass. Sept. 27, 2013).

***Second***, Plaintiff pleads no facts to support a claim that her alleged injuries were caused by Merck's supposed failure to warn Dr. Pelletier. Plaintiff spends nearly fifty pages of her Complaint attacking Gardasil's safety and efficacy and accusing Merck of fraud; yet, Plaintiff fails to connect ***any*** of these allegations to Dr. Pelletier's decision to recommend Gardasil to her in 2013. Indeed, Plaintiff fails to allege that Dr. Pelletier read—much less ***relied upon***—the Gardasil label or any other information provided by Merck. In light of Plaintiff's failure to plead ***any*** facts to show that Merck's allegedly inadequate warnings ***caused*** her injuries, her claim fails because "[e]ven if the Defendants had provided a fuller warning . . . it would have made no difference." *O'Neil v. Electrolux Home Prod., Inc.*, 2008 WL 2066948, at \*8 (D. Mass. May 14, 2008); *see also Connell v. BRK Brands, Inc.*, 2013 WL 3989649, at \*9 (D. Mass. Aug. 1, 2013) (rejecting the argument that a heeding presumption applied absent evidence that the plaintiff read the warnings).

At a minimum, Merck is entitled to notice of Plaintiff's specific factual allegations regarding (1) what information, if any, Dr. Pelletier supposedly did not know about Gardasil before she recommended Gardasil to Plaintiff in 2013; and (2) what facts, if known, would have actually altered Dr. Pelletier's decision to recommend Gardasil to Plaintiff in 2013. Plaintiff's bald legal

conclusions (without supporting facts) regarding her physician's supposed thought process and conduct, particularly where she fails even to allege that Dr. Pelletier ever read Gardasil's warning label, are insufficient to state a cause of action for failure to warn. *Flores*, 2022 WL 798374, at *5.

### 3. Plaintiff's Express Warranty Claim Fails

Plaintiff's breach of express warranty claim (Count IV) is based entirely on supposed representations to Plaintiff—not Dr. Pelletier—regarding the alleged risks of Gardasil. *See, e.g.*, Compl. ¶¶ 432-433 ("representations" including Merck advertisements, "which Plaintiff had been exposed to . . ."). As with Plaintiff's other warning claims, the Vaccine Act bars any theory of recovery predicated on Merck's alleged statements to Plaintiff. *See* Sec. III.C.2, *supra*; *Flores*, 2022 WL 798374, at *6 ("Because Flores' warranty claim is a veiled failure to warn claim, Merck's representations and statements to Flores' mother would be preempted by the Vaccine Act.").

Further, Plaintiff has not pled any facts to establish an express warranty under Massachusetts law. Plaintiff alleges only that Merck "expressly represented" that Gardasil was safe and effective. That conclusory allegation is insufficient to state a claim for breach of express warranty. *See Jackson v. Johnson & Johnson*, 330 F. Supp. 3d 616, 627 (D. Mass. 2018) (allegations that a drug "was safe, effective, fit and proper for their intended use" did not state an express warranty); *Taupier v. Davol, Inc.*, 490 F. Supp. 3d 430, 437 (D. Mass. 2020) (allegations that a defendant "expressly warranted" a medical product "was fit for use" did not allege an express warranty).

### 4. Plaintiff's Fraud Claim Fails

Plaintiff's fraud claim should be dismissed because (1) it is barred by the Vaccine Act and (2) she failed to plead with the particularity required by Fed. R. Civ. P. 9(b).

*First*, the Vaccine Act bars Plaintiff's fraud claim. Plaintiff's fraud theory simply recycles her failure-to-warn allegations. *See, e.g.*, Compl. ¶¶ 442-448 ("Merck expressly represented . . .

17

that Gardasil was safe and effective at preventing cancer. These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with Gardasil"); *see also King v. Collagen Corp.*, 983 F.2d 1130, 1136 (1st Cir. 1993) ("We further note that the fraud claim is, at bottom, a failure to warn claim."). Any theory based on a supposed failure to warn Plaintiff is barred by the Vaccine Act and should therefore be dismissed. *See* Sec. III.C.2, *supra*.

*Second*, Plaintiff's fraud theory does not meet the Rule 9(b)'s particularity requirements. *See, e.g.*, *Flores*, 2022 WL 798374, at *7 (dismissing nearly identical allegations); *Herlth*, 2022 WL 788669, at *10 (same); *Stratton*, 2021 WL 5416705, at *2 (same). In the First Circuit, Plaintiff must "specifically plead 'the time, place, and content of an alleged false representation.'" *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 22 (1st Cir. 2017). It is insufficient to base allegations on a defendant's "advertising in general" and "reputation." *Id.* "[B]road allegations of statements made in a nationwide marketing campaign are insufficient to pass muster under Rule 9(b)." *In re Zofran (Ondansetron) Prod. Liab. Litig.*, 2017 WL 1458193, at *6 (D. Mass. Apr. 24, 2017).

Plaintiff fails to satisfy these heightened pleading requirements for any of the three supposed sources of fraud in the Complaint: (1) alleged public advertising, (2) alleged marketing to the medical community, and (3) generic allegations of fraudulent "acts." Plaintiff generically refers to Merck's "ubiquitous" advertising campaigns for Gardasil, Compl. ¶¶ 344, 346, 386, 407, 433, 448, 450, but her Complaint identifies only one specific advertisement that Plaintiff allegedly "was exposed to": the "One Less" campaign. According to the Complaint, this advertisement stated that Gardasil was "safe" and effective in preventing cervical cancer. Compl. ¶¶ 83, 431, 449, 453. This cannot plausibly satisfy the "what" requirement for a fraud claim because the FDA itself has repeatedly approved the vaccine as safe and effective, but even assuming otherwise, Plaintiff also

fails to plead the ***when***. *Compare* Compl. ¶ 449 (alleging Plaintiff was "exposed to" the advertise-ment without alleging when that exposure took place) *with Learning Express, Inc. v. Ray-Matt Enters., Inc.*, 74 F.Supp.2d 79, 85 (D. Mass. 1999) (dismissing fraud claim for failure to include "any mention of time or date other than the general statement" of "[o]n or about January, 1996").

Plaintiff includes even less detail regarding any representations made to "the medical com-munity" at large. Plaintiff references "a presentation to medical doctors," Compl. ¶ 114, "door-to-door marketing to doctors," Compl. ¶ 63, and "dishonesty in the clinical tests" for Gardasil that allegedly "led many physicians to recommend the vaccination," *id.* ¶ 165—but Plaintiff does not point to specific marketing materials, the time period when this allegedly occurred, or where this marketing happened. These conclusory allegations also do not allege that Dr. Pelletier saw or relied on these statements in deciding to prescribe Plaintiff the Gardasil vaccine. This does not come close to Rule 9(b)'s required level of specificity. *See Rodi v. S. New England Sch. of L.*, 389 F.3d 5, 15 (1st Cir. 2004) (statements "made by an unidentified person at an unnamed place and at an unspecified time . . . are patently inadequate under Rule 9(b).").

The same defects persist through Plaintiff's allegations of "fraudulent acts," many of which are, once again, repackaged warning-based claims. *See* Compl. ¶ 458(d) (alleging Merck acted fraudulently by "[u]sing very restrictive exclusionary criteria in the clinical study patient popula-tion . . . but then not revealing or warning about these exclusionary criteria in the label"). But even in Plaintiff's allegations that could arguably be categorized as "conduct," Plaintiff does not even attempt to plead how or why conduct like "[f]ailing to conduct a significant number of studies" (*id.* ¶ 458(b)) constitutes fraud. *See A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (noting courts need not credit conclusory legal allegations). Thus, Plaintiff's fraud theory is not pled with the requisite specificity and should be dismissed.

### 5. Plaintiff's Negligence Claim Fails as An Improper Shotgun Pleading

Finally, Plaintiff's negligence claim (Count I) should be also dismissed because it is an improper "shotgun" pleading that fails to provide sufficient notice of her claim as required under Rule 8. *Flores*, 2022 WL 798374, at *3 (considering identical negligence pleading and finding "the remaining parts of Flores' negligence claim do not comply with Federal Rule of Civil Procedure 8(a) because they are unclear and appear to aggregate several distinct theories of liability"). Plaintiff incorporates the preceding 369 paragraphs of her Complaint into her claim and baldly avers that "Merck's negligence is outlined in detail in this Complaint, and included, among other things" a widely varied list of vague and apparently non-exhaustive allegations. For example, Plaintiff alleges Merck was negligent in the "research, manufacture, labeling and development of Gardasil." Compl. ¶ 379(k). Lumping these four separate and distinct causes of action together does not comport with Rule 8's requirement that the pleader provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Belanger v. BNY Mellon Asset Mgmt., LLC*, 307 F.R.D. 55, 58 (D. Mass. 2015) ("it would be 'unreasonable to expect defendants to frame a response to'" numerous vague and sprawling allegations).[23]

## IV. CONCLUSION

Merck requests that this Court dismiss Plaintiff's Complaint with prejudice.

---

[23] To the extent the substance of Plaintiff's allegations can be discerned, her negligence claim is redundant of her other claims and fails in kind. Plaintiffs' negligent warning claims fail for the reasons outlined in Secs. II.A, III.C.2. Compl. ¶ 379(l)–(p), (v). Plaintiff's claims for negligent "false[] advertising," "false[] promot[ion]," and other allegations sounding in fraud fail as outlined in Sec. III.C.4. Compl. ¶ 379(q)–(u), (w); *see Mulder*, 865 F.3d at 21 ("Rule 9(b)'s requirements apply to both general claims of fraud and also to 'associated claims,' . . . 'where the core allegations effectively charge fraud.'"). In fact, the ***only*** allegation in Count I that Plaintiff does not explicitly recite elsewhere is that "Merck had a duty to exercise reasonable care in the design" of Gardasil. Compl. ¶ 370. That design-defect claim is preempted. *See* Sec. III.B., *supra*.

Date: April 28, 2022

Respectfully submitted,

*/s/ Amy B. Royal*
Amy B. Royal, Esq. (BBO #647175)
THE ROYAL LAW FIRM
819 Worcester Street, Suite 2
Springfield, MA, 01151
Telephone: (413) 586-2288
Facsimile: (413) 586-2281
aroyal@theroyallawfirm.com

Edward Dumoulin (*pro hac vice forthcoming*)
Betsy Farrington (*pro hac vice forthcoming*)
Marie Notter (*pro hac vice forthcoming*)
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
200 South Wacker Drive, 22nd Floor
Chicago, IL 60606
Telephone: (312) 681-6000
Facsimile: (312) 881-5191
edumoulin@goldmanismail.com
bfarrington@goldmanismail.com
mnotter@goldmanismail.com

*Counsel for Merck & Co., Inc. and*
*Merck Sharp & Dohme Corp.*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_/s/ Amy B. Royal_

Amy B. Royal

22